## THURBER v. COMMERCIAL TRAVELERS' MUT. ACC. ASS'N OF AMERICA.

(Supreme Court, Appellate Division, Second Department. April 14, 1900.)

ACCIDENT INSURANCE—CAUSE OF DEATH—EVIDENCE—QUESTION FOR JURY.

In an action on an accident policy, the uncontradicted testimony of five medical experts showed that the insured, while in apparently perfect health, sustained an injury by a violent fall sufficient to cause death by deficient circulation through weakening of the heart, occasioned by the shock and the local injury. After a month's treatment, during which period his physician found him twice in an apparently dying condition, he started, in an unhealed condition, on a considerable journey, and, without any other known cause or illness, died four days later. The post mortem examination revealed no cause of death except such as was directly traceable to the injury, the evidence of which was distinctly visible. *Held*, that the testimony was sufficient to submit to a jury the question whether death of the insured was the result of the injury.

Appeal from trial term, Westchester county.

Action by Estella A. Thurber against the Commercial Travelers' Mutual Accident Association of America. From a judgment dismissing the complaint at the close of plaintiff's case, she appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, HATCH, WOODWARD, and HIRSCHBERG, JJ.

H. E. Lee (Arthur H. Longfellow, on the brief), for appellant.
M. W. Van Auken, for respondent.

HIRSCHBERG, J. This action is brought to recover on an accident policy insuring the plaintiff's husband in the sum of $5,000. He died on December 3, 1896, as the result, it is claimed, of an accident sustained on October 30, 1896. The case has been tried twice. On the first trial the plaintiff recovered a verdict, but the judgment entered on it was reversed by this court. Thurber v. Association, 32 App. Div. 636, 52 N. Y. Supp. 1071. On this, the second, trial, the learned trial justice, at the close of the plaintiff's case, dismissed the complaint "upon the decision of the appellate division." The previous decision by this court did not justify or require such a disposition

of the case, and there must therefore be a new trial.    The judgment was reversed, as appears by the opinion of Mr. Justice Cullen, because the plaintiff failed to prove that her husband's death was caused by the accident.    It appeared on the first trial that between the time of the injury, October 30th, and the day when the deceased left New York to go to Cleveland, Ohio, November 29th, he had practically recovered from the effects of the accident, which, as stated in the opinion, "did not seem to be of a very serious character."    The physicians who attended him during this period were not called as witnesses, and there was therefore no competent evidence of the extent of the injury, or of its relation to, and connection with, the subsequent history of the case and its fatal issue.    It then appeared that at Cleveland the deceased was attended by a physician, who testified upon the trial that he (the insured) was suffering from pneumonia and bronchitis, and that he died from heart failure, caused by those diseases.    This evidence is lacking in the present record, being presumably the affirmative defense, which was not gone into.    The only evidence tending in any way to connect the death with the accident was given by the physician who made the first autopsy, at Auburn, N. Y., where the deceased was buried.    He did not trace this connection directly, but assumed a shock at the time of the accident, which was not proved, and a weak heart, as the cause of death.    The expert who attended the second autopsy on plaintiff's behalf, Dr. Van Giesen, was examined as a witness, but the court could "find nothing in his testimony that connects the death of the insured with the physical injury."    On the other hand, the physician who attended the second autopsy in the defendant's interest testified that it would be impossible for the injury to have caused the death.    This evidence, of course, is absent from the present record.    All the physicians agreed that there was no consolidation of the lungs, a necessary incident to pneumonia, and the court assumed that the failure to find on the post mortem examinations anything which did cause the death was probably the basis for the hypothesis of the physicians that it was caused by the physical injury.    The court said:    "Of course, it is possible that the hypothesis that the witness has adopted is the true one, but suffice it to say it has not been sufficiently verified by the attendant facts to justify its acceptance as proved."    The attendant facts were the apparent entire recovery of the insured after the accident, his ability to attend to his business and to take a long journey, and his subsequent illness, in which no complaint appears to have been made by him of the injury in question.    The court concluded that "in the face of these facts, and without any evidence to show that the deceased was suffering under a condition of shock, it seems to us sheer speculation to connect the death with the injury to the testicles."

On the second trial the plaintiff called and examined, in addition to the witnesses on the first trial, Dr. Smith, the attending physician, who treated the insured immediately after the accident; Dr. Miller, who was called in consultation when the effects of the injury assumed a more serious character; and Dr. Conway, who took part in the first autopsy.    The evidence, as now presented, establishes the following facts:    The deceased, at the time of the accident, was 47

years of age, weighed 198 pounds, and was in perfect health and condition. He had been thoroughly examined by Dr. Smith the previous May, and found to be in sound and healthy condition. His heart was all right, so far as the physician could judge from such examination. On the night of October 30, 1896, he had a violent fall, occasioned by tripping on a rug, and injured his right testicle by contact with the edge of a square-cornered bed post. He was confined to his bed eight days, during which he was treated locally for the swelling and inflammation which ensued, and during which time he suffered great pain, and was in a highly fevered condition. He then went out for a short distance, on two occasions, but was taken with a chill, and obliged to take to his bed again, where he was kept under treatment for two weeks, and not allowed to move. When he left home on November 29th, to go to Cleveland, he was not entirely recovered from the effects of the accident, and, as has been said, in four days was dead. His body was brought to Auburn, where the first autopsy was performed, December 6, 1896, by Dr. O'Brien, in the presence of Dr. Conway; and on the 6th of July, 1897, at the request of the defendant, a second autopsy was had, in the presence of Dr. Van Giesen. As on the first trial, the evidence again showed that the vital organs disclosed no conditions determining the cause of death, other than those which the physicians attribute to the direct result of the accident.

Dr. Smith testified that he was called to attend the deceased on the day of the accident, and found him prostrated by the injury. He had a high fever, with a pulse rapid and weak. He was evidently suffering a great deal of pain. The scrotum was discolored black and blue, and the epididymis swollen, large, hard, and tense. He improved under applications of ice and other medication for several days, but then developed an orchitis, or an inflammation of the testicle proper, which was accompanied by a chill and fever so prostrating that the physician was obliged to employ stimulants and hypodermics to stimulate the heart. The inflammation subsided slowly, and the patient gradually gained some strength, but not as much as he should have done, in view of his favorable general condition. During this period the witness was twice called hurriedly, to find him in a fainting and apparently dying condition, from which he was revived by the use of hypodermics. He was in a condition of shock extending over the entire period, and until the time when the witness saw him last, which was either the day, or the day before, he went to Cleveland. He was then still greatly depressed and weak, and was suffering from a congestion of the lungs, hypostatic or passive, due to weak circulation,—a weak heart,—occasioned by the shock and the local injury. The injured parts were supported and fastened with adhesive straps. In answer to a hypothetical question, the doctor testified that the injuries, as seen and treated by him, were sufficient to cause the death of the insured on December 3d.

Dr. Miller testified to his examination of the deceased at the time he was called in consultation. He found him exhibiting every appearance of shock, which, by weakening the heart and lessening the circulation, had resulted in a hypostatic or passive congested condi-

tion of the lungs.  His temperature was over 102;  his respiration about 30;  his pulse 130;  his face flushed;  the pupils contracted;  the scrotum black and blue;  and the testicle itself decidedly swollen, and very painful to the touch.  He testified unqualifiedly that he believed the injury or shock to the system was the cause of death.

Dr. O'Brien testified to the results of the first post mortem, giving in detail the appearance of the injured parts and of the vital organs. The former tended to corroborate the history of the accident as already narrated, while the latter were in good, healthy condition, excepting that the lungs exhibited passive congestion.  To the court he answered that from his examination he had ascertained the cause of death, and that he was able to state that Mr. Thurber died as a result of the accident.  He added that the injury received was severe enough to give a shock to the nervous system.  On being recalled, he testified:

"When I was asked if, in making this examination of the body, I discovered the cause of death, and I answered, 'The accident,' I meant death was produced by shock following the injury.  The shock, existing for a long time, caused the weak heart, and the weak heart caused the passive congestion of the lungs, and caused death,—the three of them, one bearing on the other.  The blood, on account of the weak heart, was dammed back in the lungs, causing, as we say, a 'passive congestion,' when the blood was stagnated or congested there.  It was improperly aired;  could not receive the proper amount of oxygen that the blood should;  and from the stagnation we got the œdema, ordinarily known as 'death rattles,' and the blood—  It was impossible for the oxygen of the air to mix with the blood, and the man could not breathe any longer, and he died. That is the usual method of dying."

Dr. Van Giesen's testimony was read from the minutes of the first trial.  It related to the results of the post mortem examination made by the defendant in July, 1897.  He did not find the right testicle, but did find the sac which belonged to it, and which exhibited conditions directly traceable to a lesion of the testicle.  All the vital organs were in a normal condition,—not perfectly healthy, but in the state which would be normal for a man of the age of the deceased. The passive congestion of the lungs referred to by the other witnesses was apparent, but the lungs were not consolidated, as would be the case had death resulted from pneumonia.,  The substance of his testimony was that there was no indication of the cause of death in the organs examined, and he gave no opinion as to the cause of death. As to the missing testicle, it may be noted that on the second trial, after the reading of Dr. Van Giesen's evidence, a witness testified that he was present on the occasion of the first autopsy, and saw this testicle removed from the scrotum, dissected, and then placed back in the abdominal cavity.

Dr. Conway testified that he was present at both post mortem examinations, and that he was able to form an opinion of the cause of death from his examination of the organs.  To quote his language:

"In my opinion, the cause of his death was traumatic orchitis and epididymitis, associated with shock, resulting in passive congestion of the lungs and dilated heart.  All these conditions were dependent upon the injury to the testicle.  I found an injury to the testicle.  That resulted in inflammation. Shock followed.  That had its depressing influence upon the heart, and, as a result of the enfeebled action of the heart, there was dilation of the left side,

and a passive congestion of the lung, and the man died. Q. From which the man died? A. From which the man died."

That the testimony of these five physicians, uncontradicted, and in the absence of evidence tending to show illness of the insured other than that from which he was suffering at the time he left home, makes out a sufficient case for submission to a jury to determine whether the deceased died as the result of the injury received on October 30, 1896, can scarcely be seriously disputed. Assuming that a man, in apparent health and vigor, receives an injury sufficient to cause death by deficient circulation, through weakening the action of the heart, and under treatment for a month exhibits to skilled physicians the unmistakable conditions which tend to indicate the presence of this apprehended danger, yet starts unhealed upon a considerable journey, and without any other known cause or illness dies in a few days, and upon post mortem examination no cause of death is revealed excepting such as is necessarily and directly traceable to the injury itself, the evidence of which cause is distinctly visible, surely these facts, when fortified by the opinions of medical experts, are amply sufficient to connect the death with the physical injury, and to supply a certainty of proof not always obtainable in cases of this character. The proof, unrefuted, establishes the injury received at the time of the accident as the sole and proximate cause of death. Martin v. Association, 61 Hun, 467, 16 N. Y. Supp. 279; Bailey v. Casualty Co., 8 App. Div. 127, 40 N. Y. Supp. 513; Peck v. Association, 52 Hun, 255, 5 N. Y. Supp. 215. The other points presented on the appeal do not seem to require discussion. The judgment must be reversed, and a new trial granted.

Judgment reversed, and new trial granted, costs to abide the event. All concur.